# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**MICHAEL J. MODJESKA,**

          Plaintiff,

    **v.**                                   **Case No. 12-C-1020**

**UNITED PARCEL SERVICE INC.,**

          Defendant.

---

# DECISION AND ORDER

---

This action filed by Plaintiff Michael J. Modjeska ("Modjeska"), a former employee of Defendant United Parcel Service, Inc. ("UPS"), comes before the Court on UPS's motion for summary judgment (ECF No. 33) dismissing Modjeska's claims under the Americans with Disabilities Act of 1990, as amended in 2008, 42 U.S.C. § 12101, *et seq.* ("ADA"), based on the failure to accommodate his alleged learning disability and left arm functional limitations, harassment because of those disabilities, and retaliation (Count I); and under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA"), based on the termination of Modjeska's employment in retaliation for his alleged announced intention to use FMLA leave (Count II).

With the exception of Modjeska's failure to accommodate claim with

respect to his learning disability, UPS has failed to establish that it is entitled to judgment as a matter of law.[1] This is a case replete with genuine disputes of material fact that, in many instances, involves matters of credibility and weighing evidence by the finder of fact — neither of those tasks may be done on summary judgment. The Court provides a summary of the relevant facts and explains why UPS has not met its burden of establishing that summary judgment should be granted.

## Relevant Facts[2]

### *UPS*

UPS is a global company that delivers packages worldwide. UPS has facilities in Elm Grove, Wisconsin ("UPS Elm Grove"), and all the events at issue took place there. UPS Elm Grove uses some terms that

---

[1] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.,* 320 F.3d 748, 752 (7th Cir. 2003).

[2] Unless otherwise noted, the relevant facts are based on UPS's proposed findings of fact ("PFOF") (ECF No. 37) and Modjeska's PFOF (ECF No. 40) to the extent that they are undisputed. Citations to all quoted excerpts, including undisputed facts, are provided. A denial without citation to any factual material does not create a factual dispute.

come into play in this case: (1) "Elm Grove Twilight" refers to the evening shift; and (2) A "smalls bag" is a three foot by three foot bag that zips at the end which is used to group smaller packages together. UPS Elm Grove has union positions and employees who work in those are represented by the Teamsters union. Some, if not all, of the employees who work in UPS Elm Grove's full and part-time supervisory positions are not represented by the union.

Also involved in this case is UPS's Next Day Air delivery service, which is marketed to businesses and individuals willing to pay a premium for a promise of guaranteed, on-time delivery of important shipments anywhere in the United States or Puerto Rico by as early as 10:30 a.m. the next business day. To play its role in providing this service, each business day Elm Grove Twilight sends two tractor-trailers to a UPS hub at Milwaukee's General Mitchell International Airport — one at 7:45 p.m. and the other at 8:30 p.m. — as well as two shuttles — one at 8:50 p.m. and the other at 9:05 p.m. — and, when necessary, a third shuttle that may be sent as late as 9:18 p.m. The Next Day Air packages are loaded onto an airplane destined for UPS's Worldport air hub in Louisville, Kentucky. Packages for that plane come from multiple UPS facilities in Wisconsin, and the timely arrival of that plane at Worldport ensures that

packages are properly distributed to other planes or vehicles so that UPS can deliver them by the Next Day Air deadline the following day. A vehicle that arrives too late at the airport returns with its packages to Elm Grove, which typically delays those packages until the following evening's flight and resulting in a "service failure" — UPS's term for when it cannot honor its commitment to its customers of providing delivery on the promised date and time.

*Modjeska*

On July 5, 1999, UPS Elm Grove hired Modjeska to work as a loader, a union position. At the time Modjeska was hired he had been unable to perform college level work at the University of Wisconsin-Oshkosh and the University of Wisconsin-Waukesha. Modjeska was first diagnosed as having a learning disability in July 1999, when he was evaluated by Diagnostician Jane Grober, M.S. ("Grober"). She found that Modjeska's short-term memory was two-and-a-half standard deviations below normal, and his reading comprehension was more than one standard deviation below normal.[3]

---

[3] UPS objects to the Grober report as hearsay and states that Modjeska has not proffered Grober as an expert. (*See* Def. Resp. Pl. PFOF ¶ 5.) (ECF No. 54.) The report is hearsay and Grober's statements in that report are hearsay and do not fall within Rule 804(3). *See* Fed. R. Evid. 801(c); *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 564 (7th Cir. 1996). However, Modjeska's expert, Dr. David Osmon ("Osmon"), Ph.

Modjeska worked in a variety of UPS union positions, including as a sorter, with job duties that included reading and understanding package labels, scanning those labels into the package tracking system, sorting packages into proper bins and onto proper conveyor belts, and physically loading packages into the proper container or shipping vehicle. Modjeska attempted to work as a UPS package car driver but could not complete the route quickly enough to pass his probationary period.

While he was employed in union positions, Modjeska informed several members of management of his learning disability. When Modjeska was working as a loader, full-time supervisor Chris Clark questioned the time he was taking to load, and Modjeska explained that he had a learning disability which impaired his short-term memory and reading speed. Modjeska also told full time supervisor Ernie Turzinski ("Turzinski") about his learning disability. Turzinski questioned Modjeska's method of pulling back packages that he had just sorted, and Modjeska explained that he pulled back packages when he forgot what he had read. Turzinski asked Modjeska several times why he did not apply

D, ABPP, has relied on that report as a collateral source for background information and has analyzed Grober's findings. (Nickels Decl. Ex. E.) (ECF No. 36-1.) UPS's expert, Dr. Debra Anderson, Ph.D. ("Anderson") also considered that report and analyzed its findings. Thus, it is likely that the challenged information will be admitted into evidence under Rule 703 and, therefore, Grober's findings have been considered.

for a supervisor's position; Modjeska explained he had a learning disability of short-term memory problems and slow reading speed, and questioned whether that would be an issue if he became a supervisor.

In June 2006, Modjeska became a part-time supervisor, a non-union position. Sometime after that, Twilight Supervisor Amy Bloecher ("Bloecher") suggested hazardous material ("hazmat") training. According to Modjeska, he informed Bloecher of his learning disability and asked whether he would be given extended time to learn the material. She agreed that he could have all the time he needed, and he was allowed to take training materials home.[4] Because of his learning disability Modjeska always took longer than other employees to complete the periodic tests required of part-time supervisors. The majority of employees finished during the allotted half-hour. Modjeska never completed the test during that time; he completed the tests after his work assignments, on his off-duty time, under management supervision.

*Modjeska and UPS in 2011*

During 2011, Modjeska worked the Elm Grove Twilight shift as a part-time supervisor involved with Next Day Air service and responsible

---

[4] There is a genuine dispute regarding Modjeska's version. (*See* Def. Resp. Pl. PFOF ¶ 12.)

for the Elm Grove "air dock," the section from which the Next Day Air operations are run. In addition Modjeska had assignments in ground transportation and hazmat. Modjeska found it difficult to remember procedures for the air dock because he switched back and forth and there were a lot of certifications and procedures to remember.

As a part-time supervisor on the air dock, Modjeska supervised five to six union employees and was responsible for ensuring that Next Day Air packages were properly handled, sorted and loaded by those employees in a timely manner onto UPS vehicles departing for the airport at prescribed times. According to Modjeska, he was told that he had to perform sorting and loading as well in order to meet his responsibility for loading vehicles in a timely manner.[5] Modjeska was also required to train new employees by demonstrating proper loading techniques. In the event of a service failure, Modjeska was responsible for reporting the number of packages that failed to make the plane, photocopying the label on each package, and drafting a memo to his supervisors detailing what happened. Modjeska never told UPS Human Resources or any of his 2011 supervisors about his learning disability.

_____

[5] There is a genuine dispute of material fact regarding whether Modjeska was informed that he had to perform loading and sorting. (*See* Def. Replies PFOF ¶¶ 10, 11.) (ECF No. 53.)

Casey Wagner ("Wagner"), a part-time supervisor, trained Modjeska on the procedures for filling smalls bags. Wagner said that once the packages had been linked to the bag's label, the label allowed UPS to accurately track the location of all packages inside the bag. Wagner taught Modjeska that if asked he should estimate the package count at 30 packages per smalls bag. Some smalls bags had a lot fewer than 30 packages, while others had more than 30 packages, but 30 was a good estimate when averaging over the course of many bags.

Modjeska used the estimate of 30 packages per smalls bag on a regular basis. For example, when packages had been loaded on a tractor-trailer or shuttle, Modjeska used it to forecast the approximate number of packages that would arrive at the airport. According to Modjeska anyone reviewing his paperwork would see that he was using that estimate, since his total number of packages in smalls bags was always a multiple of 30. Other supervisors also used this estimate. No member of management ever criticized Modjeska for using the 30-package estimate until September 2, 2011.

Modjeska reported to two full-time supervisors, Nate Castro ("Castro") and Charles Crozier ("Crozier"), who together with all employees on Elm Grove Twilight reported to Hub Sort Manager Anthony

Poole ("Poole"). Poole's direct supervisor was Hub Division Manager Sherry Christian ("Christian").[6]

The events giving rise to Modjeska's claims began in late February 2011 and culminated on September 3, 2011, when Modjeska resigned — allegedly as the result of his failure to honestly report a September 1 service failure that was found to involve significantly more Next Day Air packages than he had reported. In emphasizing the importance of employee honesty, UPS has an Honesty in Employment Policy,[7] which it requires employees to sign. Modjeska signed the policy.

On February 23, 2011, Modjeska sustained a left-arm injury while

---

[6] In 2011, approximately 165 management employees and 900 union employees — reported to Christian.

[7] UPS's policy states:

> We Insist Upon Integrity in Our People. We understand that integrity is fundamental to how we run our business and essential to maintain compliance with our policies and legal requirements. Operating with integrity means we provide an atmosphere in which our people can perform their jobs in an ethical manner. We present our company honestly to employees and, in turn, expect them to be honest with us.
>
> We expect honesty from our people in all their duties, including their handling of money, merchandise, and property with which they are entrusted. We insist on integrity in the preparation and approval of all reports . . .
>
> The great majority of our people are of high moral character. However, when we do discover a dishonest person in our organization, we deal with that individual quickly and firmly. For our company to be known for its integrity, each one of us must meet high standards.

(Modjeska Dep. Ex. 2.)(ECF No. 35-1.)

trying to break a jam of packages on a conveyor belt. Within five to ten minutes Modjeska notified Crozier of his injury and that it had happened at work.

On May 5, Modjeska's physician, Dr. Patrick C. Krismer, issued work restrictions: "no lifting or repetitive bending of left elbow/arm." (Modjeska Dep. Ex. 6.) (ECF No. 36-1.) Modjeska provided the restriction to Poole. Poole acknowledges that he was aware Modjeska had injured his left arm and that he received copies of Modjeska's work restrictions starting in May of 2011. Modjeska was referred to an orthopedic specialist, Dr. Michael Seipel ("Seipel"), who saw Modjeska on May 17, ordered x-rays and continued his restrictions: no lifting greater than five to ten pounds, left upper extremity.

On May 20, Castro directed Modjeska do a hazardous materials audit. Modjeska told Castro and Crozier that most hazardous materials weighed more than ten pounds and, because of his work restrictions from Seipel, he would need an employee to help him with lifting. Each of them said no one was available. Modjeska had to do the audit by himself, which required breaking his restriction and was painful.

On May 23 Modjeska, with the assistance of his father, prepared a letter to Christian stating that his left arm injury had been aggravated by

Poole's direction that he do pushups; that Castro, his full-time supervisor, was not honoring Modjeska's work-restrictions; and if his injury did not improve he would need an MRI. (Modjeska Decl. ¶ 33, Ex. D.) (ECF Nos. 41, 41-4.) Modjeska hand-delivered the letter to Christian on about June 11, and they had a 15-20 minute conversation. According to Modjeska, Christian told him that management does not report injuries.[8]

After receiving the letter, Christian confirmed with Crozier that Modjeska had reported the February injury and arranged for it to be formally reported. After speaking with Christian in June 2011, Poole instructed Castro to prepare an injury report for Modjeska relating to his February 2011 injury and to conduct UPS's standard post-injury investigation, which included recreating the conditions of the injury so that UPS could learn from the incident and prevent similar occurrences.

There are factual disputes regarding whether Poole, Christian, and/or Castro subsequently directed Modjeska to perform physical work that exceeded his restrictions and did not provide the personnel he requested to help him do the work and/or told him that assistance was not available. (*See* Def. Resp. Pl. PFOF ¶ 39-40, 42-44.)

---

[8]There is a genuine factual dispute regarding whether or not Christian told Modjeska that part-time supervisors are not permitted to report work injuries to UPS's workers compensation carrier. (*See* Def. Resp. Pl. PFOF ¶ 36.)

During an August 30 appointment, the doctor recommended that Modjeska have surgery. However Modjeska chose a cortisone shot, and further discussion of surgery was deferred to the next appointment. As a result of this visit, Modjeska's doctor gave him restrictions of "R UE work no L UE work" (UE means "upper extremity"), and the doctor's note makes no mention of any potential surgical repair. (Modjeska Dep. Tr. 110-12, Ex. 10.) (ECF No. 36-1.)

On September 1, Modjeska was supervising the Next Day air dock, and three shuttles were sent to the airport. By 9:50 p.m., Poole was informed by UPS personnel at the airport that the third shuttle had been turned away because it was late, resulting in service failures for each package on the shuttle — that is, every package in the smalls bag and two stand-alone packages. Before the shuttle returned to Elm Grove, Poole asked Modjeska for the approximate number of packages on the third shuttle. Modjeska said 32, based on 2 large individual packages and one smalls bag which he estimated to contain 30 packages as he had been trained.

When the shuttle returned to UPS Elm Grove, Modjeska and the shuttle driver carried the smalls bag and parcels into the building — Modjeska using his right arm. Because the smalls bag was too heavy for

Modjeska to lift with his restriction, he removed several handfuls of the packages and put them in a tote in the hazmat area. He then carried the smalls bag and parcels to a small cart which he pushed through the building to the copier. After Modjeska confirmed the procedure he should follow with smalls bag supervisor Lamar Banks, he scanned the labels on the two individual packages and the label on the smalls bag.[9] Modjeska was also told to make a photocopy of the label on each of the packages.

Before Crozier and Castro left for the evening at midnight, they directed Modjeska to leave the photocopies on the office desk and to prepare an incident report detailing all events that had occurred leading to the service failures that evening. Modjeska photocopied approximately half of the total packages — representing one of the two groups into which he had separated the packages — and placed the photocopies on an office table.

Modjeska spent 1.5 hours drafting the following incident report:

> At 21:04, Debbie Hansford closed her second to last bag. It was raised up onto the grating and managed to make it into the second shuttle by

---

[9] There is a genuine dispute of material fact as to whether Modjeska was supposed to scan each package label or the label on the bag that held the packages. (*See* Def. Resp. Pl. PFOF ¶ 59.) According to Modjeska, he was taught that scanning the label on the smalls bag was proper because the packages inside had already been scanned and linked to that label. (Modjeska Dep. 118.)

21:05. Seeing as it was 21:05, the Center told me that the second shuttle was at its pull time, and that the remaining packages could be put on the third shuttle. The shuttle was then closed and sent on its way to the airport. At 21:06, I called the tower and said to have announced, "Matt Burke, report to the air dock." I then called the two metro supervisors on the radio, and asked them if either of them had seen the minivan 'car # 77075,' since it was not in Aisle F. Neither one of them had seen it, so I looked for it myself for the next two minutes, but could not find it.

Hansford's final bag was closed 21:09, and she brought it out to Aisle F for the third shuttle. Matt Burke brought one of the new package cars into Aisle F at 21:10. Seeing as how we have had trouble with forecasting the new cars, since they have not been created yet in the computer, I checked to see if the new car was in the system. The car was not in the system, and I did not want a third straight day with departure errors. I quickly told Matt Burke that he needed to grab a different older car. He moved the package car and went looking for a different one. A minute after Burke left; the primary unload had two packages brought over. At 21:14, Matt Burke returned, and said that all of the older cars around had less than 1/8 of a tank of gas, and that he needed two or three minutes to put two to three gallons of fuel in the tank. By 21:15, I had the car's numbers in the scanner, and had the two packages and the bag scanned and in the package car. Burke then drove the car over to the pumps, put fuel in and was on the access road by 21:20.

Around 21:50, I was notified that the third shuttle was told to turn around, and that the packages would not make service. When Matt Burke returned to the building, he said that the 894/94

> bypass was narrowed down to one lane through the use of cones, and that police officers were on the scene to make sure that traffic was slowed down. Burke also stated that when he arrived to the airport at 21:44, he showed them that all he had was two packages and a smalls bag. He also said that he has arrived at the airport at 21:44 in the past, and that they've taken packages before at that time. The airport told him that it was too late, and that he needed to return with the packages.

(Nickels Decl., Ex. A 46  (Modjeska Dep. Ex. 14).) (ECF No. 36-1.)

After completing the written statement, Modjeska went to his locker in the air dock area and discovered the packages he had not photocopied. It was 2:00 a.m., well beyond the end of his scheduled work time; he did not contact anyone because his cell phone was dead, but he planned to talk with his supervisors before his shift the next day.

Modjeska then recombined both groups of packages — those he had properly photocopied together with those he had not — and left them in the air dock before going home.  Over 70 packages had missed the flight and were service failures.  Modjeska knew his supervisors would realize this was more packages than he had reported, and he thought he would possibly be disciplined or suspended, but he never thought his employment would be terminated for it.

The next morning Christian received an e-mail from Scott Ross

("Ross"), who worked in UPS's early morning "preload" operations, indicating that a bag with 73 packages had been located in the air dock, where Ross had left it for investigation. When Christian found out there were over 70 Next Day Air service failures, rather than the 30-some that Modjeska had reported, she "about [fell] out of [her] chair and . . . was like panicking." (Nickels Decl. Ex. C (Christian Dep.) 109.) (ECF No. 36-3.) Christian knew Modjeska to be a loyal UPS employee who took pride in doing a good job.

Christian called her boss, Rocco Dragonetti, Package Division Manager, and asked him to confirm the existence of that number of packages. Christian then called Mike Porcaro, Package Operations Manager for UPS's Northern Plains District, to inform him that her management team had reported 35 service failures in addition to the bag of 30-something packages that her management team reported the night before, and that she was working on finding out what had occurred.

Because Poole was off work on September 2, Christian called Castro, who confirmed that Modjeska had made him aware of only 30-some service failures. This prompted Christian to instruct him to call Modjeska to find out what had happened. After attempting to contact Modjeska, Castro informed Christian that he was not able to reach Modjeska by

telephone. Modjeska had left for work because he planned to arrive early to talk to Castro.

Upon Modjeska's arrival at work on September 2 at around 4:00 p.m., he told Castro that he had separated the packages because the smalls bag was too heavy. He had forgotten about the packages and didn't realize his error until after the management team had left. When he went back down to the air dock at 2:00 a.m, he could not call anyone because his cell phone was dead. He then recombined the packages in one bag and left the facility. When reporting to Christian, Castro began by stating "[y]ou're not going to believe this," (Nickels Decl. Ex. C 118),[10] and then repeated Modjeska's explanation.

Christian did not believe any of the packages in the smalls bag were stolen or missing because Modjeska was loyal to UPS, but she did believe that Modjeska had intentionally misled his supervisors as to the number of packages that missed delivery. Christian thought Modjeska was being dishonest in his handling of the situation, probably because he was scared or too nervous to provide the actual number of packages to management. Christian's belief that Modjeska's report of the actual events was not

---

[10] Modjeska objects to the statement as inadmissible hearsay. The statement is double hearsay because Christian was testifying about what Castro said. The statement is offered as reflecting Castro's state of mind and, therefore, would be admissible. *See Luckie v. Ameritech Corp.,* 389 F.3d 708, 716 (7th Cir. 2004).

believable was based on her familiarity with Modjeska's work habits, including his consistently demonstrated attention to detail. Christian was not aware of Modjeska having any past memory issues or forgetfulness.

Christian reported on the status of the investigation to Porcaro. She spoke to him about involving UPS Security because the situation involved a serious delivery failure and, in her opinion, pointed to Modjeska having been dishonest about the incident. Christian called Brian Westbrook ("Westbrook"), Division Manager of Security, and provided a summary of the situation, indicating that UPS Elm Grove had 73 service failures in a bag and only half were reported, and that "it sounded like [Modjeska] deliberately hid the packages because he didn't want to report the full amount." (Nickels Decl. Ex. C 136.)

Among the UPS Security Department's responsibilities is the investigation of dishonest acts involving UPS personnel.[11] Westbrook informed Chavez, Security Manager, that there was a September 1 incident involving a serious service failure and directed Chavez to speak with Christian for details. Chavez's job duties include responsibility for the physical security of UPS's buildings and operations, including the

---

[11] Modjeska objects to paragraph 89 of UPS's PFOF as misstating testimony. The proposed finding cites page 15 of the deposition testimony of Anthony Chavez ("Chavez") but should have cited page 16, which supports the proposed fact. Therefore, the Court has included the finding.

security of customers' packages; and investigations into service failures, dishonest activity, workplace violence and other issues.

Christian spoke with Chavez, asking him to investigate Modjeska's actions during the evening of September 1 and report his findings. She shared with Chavez her belief that Modjeska was being dishonest in his reporting of the events. Chavez then spoke with Castro, who indicated that because Modjeska was typically very consistent and accurate in reporting service failures and would inform his supervisors of such issues at any time of the day or night, he found it very out of the ordinary that Modjeska would not have reported the additional 40 or so next-day packages that he found.

Chavez had personal experience working with Modjeska, having supervised him in the latter part of 2005 until mid-November 2006, when Chavez was a full-time operations supervisor and Modjeska was a union employee. Recalling Modjeska as an honest and solid performer, Chavez had no knowledge of Modjeska having any learning disability, including any memory or reading issues. The Security Department is not involved in handling work-related injuries. Prior to September 2, Chavez was not aware of Modjeska's left arm injury or his lifting restrictions. Chavez recalled seeing Modjeska's arm in a sling but could not remember when

that was.  He could not recall whether Modjeska was wearing a sling during the interview.

Sometime between 8:50 and 9:20 p.m.[12] on September 2, Chavez asked Modjeska to speak to him about the events of September 1.  Over the course of 45 minutes Modjeska told Chavez that he separated the packages into two groups because his lifting restriction made them too heavy for him to lift all at one time, and that he forgot about the second half of the separated packages because of his memory problems.  Chavez indicated that he did not believe that Modjeska had such an issue.  Taking into account the sheer quantity of packages involved in this service failure, Chavez did not believe Modjeska could simply have forgotten about the packages.  There are factual disputes about how Chavez conducted this portion of the interview.

Modjeska told Chavez that he did not contact his supervisors after he remembered the second half of the separated packages.[13]  Modjeska also admitted to Chavez that the management team had left when he returned to the area and reconsolidated the 70-some packages, hoping that

---

[12] There is a genuine factual dispute regarding the time the interview began. (*See* Pl. Resp. Def. PFOF ¶ 99.) (ECF No. 53.)  The 10- to 30-minute difference is not material to UPS's motion.

[13] There is a genuine factual dispute regarding the reason(s) that Modjeska provided for not notifying his supervisors on September 1.  (*See* Pl. Resp. Def. PFOF ¶ 102.) (ECF No. 53.)

his actions would go unnoticed.

At about 10:05 p.m., Chavez asked Modjeska to provide a written statement. There are factual disputes about what transpired when Modjeska was writing the statement, what Chavez stated when he brought up the subject of Modjeska resigning, and Modjeska's response. Modjeska signed a resignation on September 3, at 1:55 a.m.

Mark Green ("Green") was Director of Human Resources responsible for all non-union human resources issues in Wisconsin between 2004 and 2013. As the longstanding Director of Human Resources for UPS's Wisconsin operations, Green is generally familiar with UPS's operations in Wisconsin and he was involved in several situations in which UPS managers or supervisors found to have engaged in dishonesty or demonstrated poor integrity were either asked to resign or were discharged. Examples include Castro, Raymond Zimmerman, Michael Hengstler and Barney Hall. None of these individuals claimed to be disabled, nor did UPS have any knowledge that they were disabled; and none of them had taken or requested FMLA leave near the time of their employment separation. Prior to his discharge, Castro was disciplined for failures to perform his job duties, but his employment was not terminated for those earlier breaches because when questioned he told the truth and

accepted responsibility.  (Green Supp. Decl. ¶¶ 2-4.) (ECF No. 51.)

In 2013 Modjeska was again diagnosed as having a reading and short term memory disability by Osmon.  Osmon found that Modjeska was in the 13th percentile, below 87% of the population and more than one standard deviation below average in reading fluency.  Osmon also found Modjeska was at the 14th percentile, below 86% of the population in pulling back visual information from memory.

## Analysis

With respect to Modjeska's failure to accommodate claims, UPS asserts that Modjeska does not have a mental or physical disability, and that even if he does the relevant decision-makers were not aware of it and did not fail to accommodate either alleged disability.

To establish a prima facie case for failure to accommodate, "a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability."  *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (citation omitted).  To survive a motion for summary judgment, a plaintiff must present the Court with evidence that, if believed by a trier of fact, would establish all three elements of his claim.  *Id.*  Additionally, "the standard rule is that a plaintiff must

normally request an accommodation before liability under the ADA attaches." *Id.* (citation omitted). Once the employer has been put on notice, the employer must take reasonable steps to accommodate the employee's disability. "The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort." *Cloe v. City of Indianapolis,* 712 F.3d 1171, 1176 (7th Cir. 2013) (Citations omitted).

UPS contends that Modjeska cannot prove that he is disabled under the ADA. A "qualified individual" is someone with a disability "who, with or without reasonable accommodation, can perform the essential functions[14] of the employment position that such individual holds or

---

[14] 29 C.F.R. § 1630.2(n) provides as follows with respect to essential functions:

(1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) *The function may be essential because of the limited number of employees available among whom the performance of that job function can be distribut*ed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or

desires." 42 U.S.C. § 12111(8). Courts in the Seventh Circuit "generally defer to an employer's determination of the essential functions of a job." *Feldman v. Olin Corp.,* 692 F.3d 748, 755 (7th Cir. 2012) (citing *Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision.")).

The ADA specifies three ways one can establish a "disability:" "(A) a physical or mental impairment that substantially limits one or more major

---

ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) *The consequences of not requiring the incumbent to perform the function*;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

(Emphasis added).

life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[15]   42 U.S.C. § 12102(1); *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 606 (7th Cir. 2012).   The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of the ADA as amended ("ADAAA") regulations.  *See* 29 C.F.R. § 1630.2(j)(ix).

Modjeska asserts that both his left arm injury and his learning disability substantially limit one or more major life activities, which the ADA defines to include "performing manual tasks, . . . lifting, . . . learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

### Failure to Accommodate—Learning Disability

Modjeska asserts that his learning disability limits his ability to read and impairs his short term memory, and that UPS failed to accommodate his disability.  UPS asserts that Modjeska has not presented

---

[15] The ADA was amended as of January 1, 2009; the amended version, which changed the "regarded as" standard, applies to the actions that occurred after that date. *See Nehan v. Tootsie Roll Indus., Inc.,* No. 11 C 646, 2014 WL 3734232, at *10n.7, *11 (N.D. Ill. July 23, 2014).   Under the ADA as amended an individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.  42 U.S.C. § 12102(3)(A). However, paragraph (1)(C) "shall not apply to impairments that are transitory and minor.  A transitory impairment is an impairment with an actual or expected duration of 6 months or less."  42 U.S.C. § 12102(3)(B).

sufficient evidence to establish such an impairment. In so contending, UPS focuses on the 2013 report of Osmon and the report of its expert Anderson — arguing the relative merits of their findings, and asserts that having an impairment is not enough; rather the impairment must substantially limit a major life activity. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013.) In contending that Modjeska's impairment does not substantially limit a major life activity, UPS asserts that Modjeska's limitations are similar to those found insufficient to establish an ADA-defined disability in *Gonzales v. National Board of Medical Examiners,* 225 F.3d 620, 629 (6th Cir. 2000).

*Gonzales* was an appeal from a district court's decision following a four-day preliminary injunction hearing involving the weighing of conflicting expert opinions and credibility assessments, not a summary judgment determination. *Id.* at 625, 628. Furthermore, *Gonzales* involved an analysis of facts within a legal framework that has undergone considerable re-working. As noted earlier, Congress amended the ADA in 2008 "to carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' and 'clear, strong, consistent, enforceable standards addressing discrimination' by reinstating a broad scope of protection to be available

under the ADA." P.L. 110–325(b)(1). These amendments included significant changes to the "substantially limits" standard and expressly overruled the standard set forth in *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002). The regulations now provide:

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.
>
> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.
>
> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. *Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.*
>
> (iv) *The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree*

- 27 -

> *of functional limitation that is lower than the
> standard for "substantially limits" applied prior to
> the ADAAA.*

29 C.F.R. § 1630.2(j)(1)(i)-(iv) (emphasis added).  For those reasons, the

Court does not find UPS's reliance on *Gonzalez* compelling.

There is no doubt that UPS has presented conflicting evidence

regarding the extent to which Modjeska is impaired; however, construing

the evidence in the light most favorable to Modjeska, he has presented

sufficient evidence upon which a reasonable jury could find that he is

impaired in the major life activity of reading and thinking (short-term

memory).  Regardless, the undisputed evidence establishes that as of 2011

Modjeska had not informed the UPS personnel office, Christian, Poole, or

Castro of his impairment; nor had he requested an accommodation in his

reporting requirements.

Modjeska alleges that UPS failed to accommodate him because it did

not give him enough time to read and understand his own written

statement during his security interview.  There is a factual dispute

regarding whether Modjeska asked for more time for any reason.

However, Modjeska has not explained how allowing him more time to

complete his written statement might have helped him to write a more

truthful and accurate statement of events.  Thus, Modjeska's failure to

accommodate claim based on his learning disability is subject to dismissal upon summary judgment.

*Failure to Accommodate—Left Arm Impairment*

UPS asserts that Modjeska's left arm impairment was not a qualified disability, noting that it was transitory. However, the cases that it cites regarding a short term impairment pre-date the 2009 amendments to the ADA. (*See* Def. Br. Summ. J. 22 (citing *Waggoner v. Olin Corp.,* 169 F.3d 481, 484 (7th Cir. 1999) ("Disability does not include temporary medical conditions."); *Hancock v. Potter,* 531 F.3d 474, 479 (7th Cir. 2008) (dismissing plaintiff's ADA claim where plaintiff had a work-related back injury that temporarily limited her ability to perform certain job duties); *Burnett v. LFW Inc.,* 472 F.3d 471, 484 (7th Cir. 2006) (plaintiff not disabled where he failed to show that his temporary restriction on heavy lifting and strenuous activity substantially limited his ability to perform a class or broad range of jobs).) (ECF No. 38.)

District courts within this circuit have recognized that while a temporary impairment may not have been considered a disability prior to 2009, the regulations of the ADAAA provide that "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section." *Maxwell v.*

*Cnty. of Cook,* No. 10 CV 00320, 2014 WL 3859981, at *4 (N.D. Ill. Aug. 4, 2014) (quoting 29 C.F.R. § 1630.2(j)(ix) (2011)). *See also, Bob-Maunuel v. Chipotle Mexican Grill, Inc., No.* 12 C 750, 2014 WL 185978, at *16 (N.D. Ill. Jan. 15, 2014); *Nayak v. St. Vincent Hosp. & Health Care Ctr., Inc.,* No. 1:12-CV-0817-RLY-MJD, 2013 WL 121838, at *3 (S.D. Ind. Jan. 9, 2013) (Denying motion to dismiss on ADA claim noting the current change in the law stating that an impairment lasting less than six months can be substantially limiting.)

*Bob-Maunuel*, 2014 WL 185978, at *15, also states that the Seventh Circuit has not addressed the issue of whether lifting restrictions are substantial limitations under the standard outlined in the ADAAA; however, a Northern District of Illinois court applying the amended standard found that a plaintiff's lifting restriction substantially limited a major life activity. *Id.* (citing *Heatherly v. Portillo's Hot Dogs, Inc.,* No. 11 C 8480, ___ F.Supp.2d ___, 2013 WL 3790909, at *6 (N.D. Ill July 19, 2013)).

UPS also cites one case decided under the amended ADA's broadened definition of disability, asserting that Modjeska's temporary impairment does not render him disabled within the meaning of the statute. *See, e.g., Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d

193, 211 (D. Conn. 2012). The Connecticut district court's *Wanamaker* decision is not persuasive or analogous. The decision, granting a motion to dismiss an ADA claim based on transverse myelitis, involved a plaintiff who had not alleged that the condition substantially limited any major life activity. Notably, the court gave her leave to amend her complaint to correct that deficiency, if she could. *Id*. at 212.

In light of the 2009 amendments, the case law UPS cites does not provide a basis for finding that Modjeska's left arm impairment is not a disability for the purposes of the ADA as amended. UPS also contends that it reasonably accommodated Modjeska's lifting limitation. However, whether it did is a matter of factual dispute that cannot be resolved on summary judgment. Thus, summary judgment as to Modjeska's failure to accommodate his left arm impairment is denied.

### *ADA Retaliation Claim*

UPS also contends that it did not retaliate against Modjeska because of any disability. The ADA protects employees from being retaliated against for asserting their ADA rights. 42 U.S.C. § 12203(a). A plaintiff may proceed under the "direct" or "indirect" method of proof to establish a retaliation claim. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Employers are forbidden from

retaliating against employees who raise ADA claims regardless of whether the initial claims are meritless. *See Squibb v. Mem'l Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007) (regarding ADA discrimination claims). Modjeska states he has presented sufficient evidence under the direct and indirect method of analysis.

Under a direct method a plaintiff must show that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) there is a causal connection between the two. *See Dickerson,* 657 F.3d at 601. Both sides agree that Modjeska engaged in a protected activity (requesting accommodations for his physical disability) and that he suffered an adverse employment action (the security interview which led to his resignation or termination). Modjeska also relies upon the information he claims to have provided to Poole on September 1, including the fact that he could not use his left arm for work and might need surgery which would require a two to three month absence. However, there is a factual dispute regarding whether this occurred.

There is also the question of whether a reasonable jury could infer a causal link between the two. *See Cloe,* 712 F.3d at 1180. UPS states that Modjeska's own act of concealing the true number of service failures put in motion the sequence of events leading to the security interview at which

he resigned or was terminated. Viewing the facts in the light most favorable to Modjeska, he forgot the unreported items and was being truthful.

In support of his assertion that there is a causal relationship, Modjeska cites the following five pieces of "evidence:"

> (1) When Modjeska came to Christian to say his restrictions were not being honored, she said supervisors do not report work injuries, stating her displeasure with his protected activity.
>
> (2) Modjeska's requests for accommodation were ignored or directly violated by the superiors from whom he requested the accommodation, Castro, Crozier, Poole, and Christian. This was not isolated but occurred repeatedly. Indeed, just days after Modjeska protested the lack of accommodation, Christian joined Poole in directing that Modjeska perform a bargaining unit position which required violating his restrictions notwithstanding his protest.
>
> (3) There is no evidence of Modjeska's alleged dishonesty. All Poole ever requested from him was an estimate which he provided consistent with his long-established practice of 30 packages per smalls bag. Modjeska did report all 70 packages missing by exception scanning the bag tag. The method he used was consistent with his training and is not evidence of any dishonesty.
>
> (4) There is no evidence of any other security investigation of an employee for dishonesty related to job performance. All security reports covering Christian's area of responsibility other than Modjeska's related to involvement with

illegal drugs or theft.

> (5) Even if contrary to prior practice an
> investigation of Modjeska could somehow be
> considered non-discriminatory, the manner in
> which it was commenced by Christian's specific
> suggestion that Modjeska had been dishonest and
> the manner in which it was carried out, with
> yelling, accusations, threats, including dishonest
> threats concerning the consequence of not
> resigning, are not consistent with a good faith
> investigation but rather with an effort to engage
> in an unjustified termination.

(Pl. Br. Opp'n Summ. J., 24-25) (ECF No. 45.)   Genuine disputes of fact

exist regarding how Christian responded to Modjeska's complaints that

his restrictions were not being honored, and the manner in which

Modjeska's supervisors treated his requests for accommodation of his left

arm impairment.   There is also is factual dispute regarding what Poole

told Modjeska to do in terms of reporting the service failures.

With respect to Modjeska's contention that Christian never ordered

a security interview of an employee in a case which did not involve theft or

drugs, UPS has presented evidence it says indicates that one month after

Modjeska's separation Christensen "ordered a security investigation based

on disparities she found in UPS's global scanning system."  (*See* Def. Resp.

to PFOF ¶62.) (ECF No. 54.)  Neither UPS's statement nor the underlying

memo relied upon (*see* Nichols Supp. Decl., Ex. F (Memo from Christian

dated October 17, 2011, "Re: . . . Poole — GSS integrity") (ECF No 52-6) directly contradict Modjeska's assertion, which relies upon UPS's response to question one of Modjeska's third set of interrogatories: "UPS is not aware of any such instances aside from the Plaintiff's." (Robbins Decl. Ex. 9.) (ECF No. 42-8.) This too presents a factual issue for the jury.

There is also a factual dispute about how the security interview was conducted. Viewing the disputed facts, a reasonable jury could conclude that the response to the under-reporting of packages was based on UPS's frustration with Modjeska's increasing requests for accommodation. Given that Modjeska has presented sufficient facts to overcome summary judgment under the direct method of analyzing a retaliation claim, analysis under the indirect method of proof is unnecessary.

### *FMLA Retaliation Claim*

The FMLA makes it unlawful for an employer to discharge or discriminate against an employee for opposing a practice made lawful by the Act. 29 U.S.C. § 2615(a)(2); *Caskey v. Colgate-Palmolive Co.,* 535 F.3d 585, 592 (7th Cir. 2008). To establish a FMLA retaliation claim under the direct method, Modjeska "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Id.* at 593. The causal-

nexus element may be met through either a direct admission from the decision-maker or through "a convincing mosaic of circumstantial evidence" permitting that same inference. *Pagel v. TIN Inc.,* 695 F.3d 622, 631 (7th Cir. 2012) (quoting *Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 771 (7th Cir. 2008)). The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination. *Id.*

Under the indirect method, an employee must establish a prima facie case by proving that he (1) engaged in a statutorily protected activity; (2) met his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 784 (7th Cir. 2007) (citation omitted). Once the prima facie case is established, the burden shifts to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual. *Id.*

There are factual disputes regarding whether Modjeska engaged in

statutorily protected activity. However, considering the claim under the direct method of proof and construing the facts in the light most favorable to Modjeska, the Court accepts as true the evidence that Modjeska (1) presented his physician's note to Poole on September 1, (2) told Poole the note said no left upper extremity work, (3) told Poole that Seipel was recommending surgery and, (4) said that if he did decide to have the surgery he could be out of work for two to three months to recover.[16] The Court also accepts as true the fact that Modjeska was forced to resign the following day. Thus, prongs one and two of the direct method of proof are satisfied.

With respect to a causal relationship, Modjeska states that Poole and Christian had regular meetings regarding Modjeska's work-related injury, citing page 86 of Christian's deposition, and contends it is likely that Poole told Christian about the surgery.[17] (Pl. Br. Opp'n Summ. J., 29-30.) (ECF No. 45.) The inference that Poole told Christian about the surgery is addressed in paragraph 17 of Poole's declaration and paragraph

---

[16] The FMLA regulations state that "[a]n employee must provide the employer at least 30 days advance notice before FMLA leave is to begin if the need for the leave is foreseeable based on . . . planned medical treatment for a serious health condition of the employee . . . ." *See* 29 C.F.R. § 825.302(a).

[17] This fact, cited in Modjeska's brief does not appear to have been included in a proposed finding of fact, and page 86 of Christian's deposition was not filed by either party. However, in the absence of an objection by UPS, it has been considered.

11 of Christian's supplemental declaration. (ECF Nos. 47, 48.) Poole avers he never told anyone that Modjeska might or would need surgery, and Christian avers she was not aware that Modjeska might or would need surgery for his 2011 left arm injury.

What Poole was told by Modjeska is a matter of factual dispute which cannot be resolved on summary judgment. Furthermore, the statements in the Poole declaration and Christian's supplemental declaration do not preclude Christian's knowledge of Modjeska's request for two to three months of FMLA leave. Construing the evidence in the light most favorable to Modjeska, a jury could conclude that Poole told Christian about the anticipated leave, and that a causal connection could exist. Thus, construing the evidence in the light most favorable to Modjeska, under the direct method of proof his FMLA retaliation claim withstands summary judgment.

### ADA Harassment Claim

Modjeska's ADA claim includes an allegation that he was harassed as a result of his disabilities. Neither UPS's summary judgment motion nor Modjeska's response explicitly address the claim. Thus, it is unclear whether Modjeska continues to pursue that claim.

To establish such a claim, Modjeska would have to demonstrate that

the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Hancock,* 531 F.3d at 480. (Citation omitted). In Modjeska's case, he would have to show that he was subjected to unwelcome harassment based upon his disabilities. *Id.*

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

UPS's motion for summary judgment is **GRANTED** (ECF No. 33) as to Modjeska's claim that UPS failed to accommodate his learning disability and **DENIED** in all other respects.

Dated at Milwaukee, Wisconsin, this 16th day of October, 2014.

> **BY THE COURT:**
>
> _____
> **HON. RUDOLPH T. RANDA**
> **U.S. District Judge**